Lockett v. The Merchants Insurance Company of New Orleans.

EDWARD LOCKETT *v.* THE MERCHANTS INSURANCE COMPANY OF NEW ORLEANS.

Where a vessel on whose cargo insurance has been effected, stops, in descending a river, at different places, for the purpose of taking in further cargo or passengers, such stoppages will not amount to a deviation, when proved to have been conformable to the usages of the trade, and of no unusual length.

APPEAL from the Commercial Court of New Orleans, *Watts,* J.

This was an action to recover $10,000, the insurance upon fifteen slaves, valued equally, at and from Richmond to New Orleans, shipped on the brig Creole, on the same voyage as those insured in the case of *McCargo* v. *The New Orleans Insurance Company, ante p.* 202. The answer admitted the signing of the policy; denied generally the allegations of the petition; and specially denied that preliminary proof had been furnished, and that plaintiff had complied with the warranties, which he was bound to fulfill. The policy provides that the company take upon themselves the risks of " takings at sea, arrests, restraints, and detainments of all kings, princes, or people of what nation, condition or quality soever, barratry of the master or mariners, and all other perils, losses, or misfortunes that have or shall come to the hurt, detriment or damage of the said goods and merchandize, or any part thereof, to which assurers are liable for." A memorandum appended to the policy declares, "the company not liable for suicide, desertion or natural death, but liable for risks of emancipation, detention, or seizure by foreign powers." The evidence establishes the same facts as were proved in the case of *McCargo* v. *The New Orleans Insurance Company.* The Log-book, which was offered in evidence, shows the following entries:

" LOG BOOK. Remarks on board the brig Creole, Capt. Robert Ensor, from Richmond bound to New Orleans. Cargo, tobacco ; two cabin passengers, and 150 slaves.

Remarks—Monday, Oct. 25, 1841.—All this day clear and cold, at midnight left Richmond in tow with steamer Ben Sheppard. Ends this day.

Remarks—Tuesday, Oct. 26, 1841.—All this day fresh gales

from S. W. and clear wr. At eight A. M. cast off from the steamboat, and made *sail* at ten A. M. Came to anchor at Minse's at one P. M. Got under way and worked down the river. At nine came to anchor at Hog Island. So ends this day.

Remarks—Wednesday, 27th Oct. 1841.—All this day light breezes from S. E. and clear. At six A. M. got under way and worked down the river. At six P. M. came to anchor at Day's Point. Put Captain Ensor on board the steamboat for Norfolk, and took three negroes on board. So ends this day.

Thursday, 28th Oct. 1841.—All this day fresh breezes from S. E. At noon got under way. At five P. M. came to anchor at Newport News. Capt. Ensor came on board with thirty-three negroes. So ends this day.

Friday, Oct. 29, 1841.—All this day fresh breezes from east, and some rain. At one got under way. At four came to anchor at Sewel's Point. So ends this day.

Saturday, Oct. 30th, 1841.—All this day, light, variable winds. At eleven A. M. got under way, and worked down the bay. At eight P. M. came to anchor in Linhaven Bay, in company with brigs Orleans and Long Island, and several other sail. So ends this day.

Sunday.—Nothing of importance. Got under way and proceeded to sea. Winds S. E. etc."

It appears from the protest made at New Orleans, which was introduced in evidence by the plaintiff, that after leaving Richmond, "the brig proceeded to Hampton Roads, and lay there one day, when about eight slaves were put on board by Mr. W. W. Hall for Mr. Hatcher, two by Mr. C. H. Shield, and twenty-three for Mr. Johnson, making the whole in number one hundred and thirty-five."

*Ensor*, the master of the Creole, deposed, that some of the slaves were taken on board after leaving Richmond, "two miles below in James river," and "that two or three of McCargo's slaves were put on board about one hundred miles below Richmond." He further stated, that "he went in a steamboat from James river to Norfolk."

There was a verdict and judgment for the plaintiff for $9,333 33, the sum of $666 66 being deducted as the value of

one of the slaves, admitted to have reached New Orleans in safety. The defendants appealed.

*F. B. Conrad, T. Slidell* and *Benjamin*, for the appellants.

I. The vessel deviated in that part of the voyage performed between Richmond and the Atlantic Ocean, and thereby all claim under the policy for any subsequent loss was forfeited. See the log-book, from 25 to 31 October.

It appears by the testimony of Gifford, in corroboration of the log-book, that the captain *left* the brig in the river on the 27th October, and proceeded to Norfolk by the *steamboat:* the Creole was *detained* in *Hampton Roads* one day, where she took in the balance of the slaves. The protest made at New Orleans, and the other evidence confirm these statements. The circumstances thus established, amount to a deviation, and absolve the insurers from further liability. "Deviation," says Hughes, p. 139 (183), "signifies a departure without necessity or justifiable cause from the usual course or line of the voyage. Thus if a master touch at a port for a purpose not connected with the voyage, or touch at a port not in the course of the voyage, though only a few leagues out of the way, or *touch at a port at which it is not usual to touch, although one by which the ship must necessarily pass, or stay an unusual time;* or if, when there are several courses or modes of performing a voyage, the master select a particular track for a purpose foreign to the object of the voyage, instead of adopting that which is the safest and most eligible, considered merely with reference to the voyage insured; or if, *having liberty to touch at one port, he touch at another,* or touch at a place mentioned in a liberty, but for an unauthorized purpose; this departure from the course prescribed by usage and the terms of the policy is, in such case, a deviation, and absolves the underwriters from further liability. The criterion to distinguish between a change of voyage and a deviation is, whether the *termini* of the voyage are preserved or not."

"If the vessel touches or trades at intermediate ports in the course or track of the voyage, she deviates only, but does not desert the voyage. The question of deviation turns on that distinction." 1 Hall's Sup. C. Rep. 369. 2 Caines, 274.

"The effect of a deviation is *not always to increase the risk,* its effect is to *vary* the risk; and as it attempts to introduce a new responsibility instead of that to which the underwriters agreed, it discharges them from further liability. And whether the insurance is on ship, goods or freight, whether the insurers are *privy* to the deviation or not, or *from whatever cause a loss which happens afterwards may arise, a deviation is equally fatal.*"

The only right of stopping given in the policy is, if thereto obliged by stress of weather, or other unavoidable accident. This is, in fact, in accordance with the well recognized principles of insurance laws. A deviation (and a stoppage is a deviation) can only be justified either by necessity, or by well established usage.   Park on Insurance, 400, 401, 411.

Without attempting to overthrow these principles, the plaintiff sets up no other excuse than this : that from the course of James River, and the geographical position of the various points, taken into consideration with the state of the winds, as shown by the log-book, and the ebb and flow of the tides, the stoppages were *necessary*, and must be so supposed.

This apology will not stand the test of scrutiny.

Thus, during the whole of Oct. 26, 1841, there were fresh gales from the S. W.   At eight A. M. they cast off from the steamboat and came to anchor at ten A. M. of the same day. As the wind was the same, their anchoring could not be attributed to an unfavorable wind.

On the 27th Oct.—*All this day,* light winds from the S. E. and they got under way at six A. M.   How is it, if their stopping that day was owing only to unfavorable wind and tides, that we find the singular coincident circumstance of the captain going on shore, and negroes being taken on board at that very point.

Common sense must attribute the stoppage to the desire of transferring the captain to another conveyance, and of taking in, pursuant to a preconcerted arrangement, a portion of the cargo engaged to be received at that point.

Again, on the 28th Oct.—*All this day fresh breezes from the S. E.*   How is it, that with the wind unchanged, it was necessary to come to anchor at 5 P. M. at Newport News ?   The answer is obvious ; it was here that, by preconcerted arrangement, Capt. Ensor was to embark, as the log-book shows he did, thirty-three negroes.

Again, on Oct. 29, 1841.—*All this day* fresh breezes from the east.   Why, with the same wind, was it necessary to come to anchor again?

Again, on the 30th, more slaves are taken on board, (See Gifford's evidence,) and we are not informed by the testimony, whether, without this cause of delay, and the absence of the captain, the vessel might not have proceeded to sea.

The unprejudiced mind must, we think, be satisfied, that, without the delay occasioned by the repeated stoppages to take in cargo, and the absence of the captain, the Creole, which departed from Richmond on the 25th Oct. (See Gifford's evidence), would have got to sea before the 31st Oct.   Will any one pre-

sume to say, that the risks of the river and of the sea, to which she was exposed, the risks of wind, weather, and others, were the very identical risks to which she would have been exposed if these delays had not been incurred. Whether the risks were enhanced or diminished, is immaterial ; it is enough that *they were not the same.*

But again, if it should be suggested that one of these stoppages—that at Hampton Roads—was justified by the fact of our insuring negroes from Norfolk for Mr. McCargo, this excuse as to this particular stoppage will be found untenable ; for the vessel did not stop at Norfolk, *at and from which* certain slaves were insured, but at Hampton Roads, and slaves were there taken on board. Norfolk is one place ; Hampton Roads is another place. Norfolk is a port ; Hampton Roads a roadstead. The one is nine miles from the other. The course of a vessel sailing from Richmond *via Norfolk* to the sea. would be materially different from the course of a vessel sailing from Richmond to the sea, *via* Hampton Roads only. This is obvious from a glance at the map.

Now if it were possible to consider the fact of this company having insured other slaves of another party " at and from Norfolk," as tantamount to an express stipulation that the vessel might stop at Norfolk, yet even an authority to stop and take in cargo at Norfolk, would not justify a stoppage and taking in of cargo at Hampton Roads, even though Hampton Roads were a *safer* place than Norfolk, which is not proved, and which no one can suppose, and even although it be a *shorter* route to New Orleans than *via* Norfolk itself. See Hughes on Ins., 140 (183).

To test this question in another form, let us enquire whether slaves insured in a policy *at and from Norfolk*. which is the case in McCargo's policy, would be covered, if not laden on board at Norfolk, but at Hampton Roads. Let us concede, if the plaintiff desire it, that on a voyage from Virginia to New Orleans, Hampton Roads would be nearer to New Orleans than Norfolk. Let the question be answered by the following decisions, two of them rendered by one of the great lights of insurance law, Lord Mansfield ; another by Judge Thompson, then of the Supreme Court of New York, and afterwards of the Supreme Court of the United States.

In the first case, *Constable* v. *Noble* (2 Taunton 402), it was decided that, a policy at and from a place, the name of which equally designates a particular town, and a port comprehending an extensive district of coast, does not protect a cargo laden anywhere within the limits of the port, but refers to the town itself.

In *Payne* v. *Hutchinson* (2 Taunton, p. 404, *in note*), it was de-

cided that if a policy describe a voyage at and from a place which is the head of a port, it will not cover a voyage at and from a distinct place, which is a member of the same port.

In the case of *Murray* v. *The Columbian Insurance Company*, (4 Johnson, 443), a vessel was insured *at and from Calcutta*, to New York, with liberty to *touch at Madras* for trade, and to take in part of her cargo there. The vessel went to Madras, and sailed thence direct to New York, without even going to Calcutta. In an action brought by the insurer to recover back the premium, it was held that the voyage insured did not commence; and that as *the policy never attached*, the insured was entitled to a return of premium.

In deciding this case Judge Thompson observed, in refutation of the argument of counsel, which was, though he could not go first to Madras, and then to Calcutta, he might come home direct from Madras, *for it shortened the voyage*, and greatly diminished the risk, that " *whether the risk was increased or diminished*, by the ship's not going to Calcutta, may be uncertain; it is enough that the parties *have, by their contract, designated that as the place where the risk is to commence*, and it is not competent for the court to substitute any other in its stead."

*Peyton* and *I. W. Smith*, contrâ.

The appellants contend that there was a deviation before the Creole got to sea. To determine what facts amount to a deviation, the great principle of indemnity is to be constantly kept in view as the basis of the contract. Allowance must be made for the delay usual for the purpose of taking on board the cargo, and for every other act of preparation which may be fairly supposed to be done in view of the object and scope of the voyage. Such detentions, whether they be to obtain a full cargo, or to obtain passengers, or to complete the outfits, are considered as the incidents of every sea voyage, and as properly left to the discretion of the master and owners of the vessel.

Especially should allowance be made for such delays and hindrances, when they occur in river navigation, which, from its nature, is subject to so many interruptions and detentions not to be encountered in open sea. The whole doctrine of deviation is only applicable to a vessel which has completed her cargo, made all her preparations for the voyage, has actually taken her departure from port, and has spread her canvass upon the open sea. Nor can it be said that this view of the law leaves too much latitude to the insured. The other rule, that the voyage must be commenced within a reasonable delay after the policy is effected, and must be prosecuted with reasonable despatch and diligence, is amply sufficient to protect the rights of

the underwriter, as to all the detentions and delays incident to the fitting out and departure of the vessel.

The petition of the plaintiff sets out fully the grounds on which he relies for a judgment upon his policy. The answer of the Company, after pleading a general denial, denies specially that the preliminary proof has been duly furnished, and that the plaintiff has fulfilled the warranties which he was bound to fulfill. Thus no notice was given by the answer that the detentions of the river, or the manner and places of taking the slaves on board, would be relied on to establish a deviation, or a different voyage, and thus avoid the policy. The evidence having been received without objection, must of course be judged according to its legal effect; but is it not a fair rule of evidence, that the defendants are bound to show much more clearly the facts to establish the alleged deviation, than if they had, among their special denials, directly called the attention of the plaintiff to the subject, and thus put him on his guard? The plaintiff was kept equally in the dark in the taking of the immense mass of testimony which encumbers the record. A single commission was taken out by the Company, and, at great expense, many witnesses were examined, but nothing in the interrogatories bore the slightest relation to this alleged river deviation.

In the rigid and severe cross examination of our witnesses, not a question was propounded, nor an intimation thrown out, of any thing like river deviation. Neither during the trial, nor up to the moment the charge was delivered to the jury, had the river deviation been conceived. The only question of deviation arose from the occurrences of Sunday night, the 7th of November. The river deviation was not alluded to until the argument in this court.

Gifford, in his examination in chief, referred to the log-book to refresh his memory as to the precise position of the brig on Sunday evening, and as to the dates, whereupon the log-book was annexed as a part of his deposition. It was referred to for no other purpose, nor was it supposed material to his examination for anything else. But the entries are now relied upon to make out a deviation. Let us see what they establish.

It appears by the log-book, that on Monday, at midnight, the Creole left Richmond in tow of the steamer Ben Shephard, and that she continued in tow of the steamer until the next morning at eight—a period of eight hours—when she cast off from the steamer, and made sail, with fresh gales from the south west, but that she stopped from 10 to 1 o'clock at Minn's, ànd then worked down the river till 9, when she reached Hog Island and anchored for the night.

It appears also from the log-book, that on the next morning they got under way at 6, and worked down the river to Day's Point, which they reached at 6, P. M., and, the breeze being light and from the south-east, they came to anchor. The next morning the wind had become stronger, and was from the same unfavorable direction. They however got under way at noon, and were enabled to reach Newport News, where they anchored at 5, P. M. The next day the wind continued fresh and easterly, and it rained; they did not get under way until 1, P. M., and reached Sewell's Point at 4, when they anchored for the night. The next day the wind was light and variable, and they did not get under way until 11. They worked down the bay, and anchored at 8, P. M., in Linhaven Bay, in company with several brigs and other vessels.

Captain Ensor, left the vessel at Day's Point, on Wednesday evening, for Norfolk, and returned on board the next day, at Newport News. It appears that three slaves were taken on board at Day's Point, and thirty-three at Newport News. There appears nothing singular in these facts, for the brig had been receiving the slaves from the 20th of November.

These are all the facts proved as to this river deviation. The depositions of the witnesses state some of the facts in different words, but it is in substance the same; nor can the defendants eke out the testimony by resorting to matters *dehors* the record.

It is argued that on the 30th, slaves were also taken on board. We apprehend that the idea is entirely erroneous, and that the record affords not a scintilla of evidence in support of it.

Whether the fact of the brig coming to anchor at the different places, as she did, was caused by the ingress of the flood tides, or by unfavorable winds at the particular places of anchoring, or by reason of it's not being safe to proceed at night, does not appear, In the various windings of the narrow channel of a shallow river, delay is often necessary, to wait for a wind different from that which is favorable according to the general course of the stream.

If any doubt can arise from the statements of the log-book as to whether there was a deviation, the other evidence will remove it. The Company sign one policy in favor of McCargo, from Norfolk, on the 17th November, and on the next day they sign the other policy in favor of Lockett, from Richmond; both policies being for slaves laden on board the same vessel, and on the same voyage to New Orleans. The only reason for not commencing the risk on McCargo's policy from Richmond, in the same manner as on Lockett's policy, is found in the evidence of Capt. Ensor, who proves that two of the slaves were actually put on board the brig two miles below Richmond. Hence Norfolk

was inserted as the point from which the risk should commence, for if Richmond had been inserted it might have created all difficulty in relation to those two slaves.

The testimony of the witnesses who were examined, proves that there was a strict compliance with the usages of the trade. It thus appears that it is the custom for vessels starting from Richmond to bring a cargo of slaves to New Orleans, to com-plete their cargo at other points down the river, especially at Norfolk. It also appears to be the usage, that, for all the purposes of the voyage, being opposite the city of Norfolk in or near Hampton Roads, is considered as being at Norfolk, for the purpose of conveying slaves to New Orleans, though a steam-boat is employed to bring them to the vessel.

Hughes describes a deviation as taking place, if the vessel "touch at a port where it is not usual to touch, or stay an unusual time ;" by which he clearly intimates that the vessel must either go out of her usual course to touch at a place after the voyage is commenced, or, if it is usual to touch there, the stay must not be for an unusual time. Has either fact been proved here ?

The case of *Payne* v. *Hutchinson*, only decides that a policy on a voyage from one port, does not protect goods shipped from another port in the same custom-house district.

The case of *Constable* v. *Noble*, decided by the same judge, turned upon the same point. That case differs from this, in the following particulars :

The point was expressly made before the jury, and testimony proving all the facts, was received on both sides.

In that case Lord Mansfield said : " If the plaintiff in this case could have proved a usage for ships to load at Bridgport, on a policy at and from Lyme, it might have assisted him ; but no usage was proved here. Probably the underwriters never *un-derwrote a voyage from Bridgport in these terms. The whole is obviously a mistake*," &c.

It was proved that, though by an air line Bridgport was a few miles nearer to London, and that a vessel, in going from Lyme to London, had to cross the bay on which Bridgport was situated, it could not be said, owing to the different courses it was necessary to take to double Portland Bill, that from Bridg-port it would be the easiest or quickest route.

In that case it was decided that the policy never attached, be-cause the parties were evidently mistaken as to the voyage insured. They both believed at the making of the policy, say the court, that because one vessel insured by the same policy was to make the voyage from Lyme to London, therefore the other vessel was to pursue the same voyage. Such an insu-rance was never before made. But here the insurers, in the brief space of twenty-four hours, issue both policies upon similar

property, at the same rate of premium, on the same vessel, and on the same voyage, an intermediate port being taken for one of them as the commencement of the risk! If the argument of the defendants were good, what would become of policies from Pittsburg and Cincinnati to New Orleans, on the same boat and the same voyage?

Two other cases relied on by our opponents are equally significant. The vessel insured from Liverpool to London, had to go at least sixty miles out of her way to get to Loo; and the vessel bound from Dunkirk to Leghorn had to cross the English channel to reach Dover. This was, in each case, in direct violation of the usual course of the voyage. How far did the Creole go out of her way, and what channel, bay or river did she cross?

They also rely on Murray v. Columbian Insurance Company. In that case the policy was annulled, because the vessel had, instead of commencing the voyage at Calcutta, the terminus of the policy, commenced it at Madras—five hundred miles distant.

It is evident that the facts proved do not in any manner affect the liabilities of the underwriters. They know and are bound by the usages of the trade, in the transportation of slaves from Richmond and Norfolk to New Orleans. Having taken risks from each of those ports, on the same voyage, they have recognized those usages at the making of the contracts.

Eustis, also appeared for the plaintiff.

BULLARD, J. This is the last of the Creole cases, and is an action on a policy upon fifteen slaves, " at and from Richmond to New Orleans."

The grounds of defence common to this and the other cases, have already been considered; and the only one peculiar to the present case is an alleged deviation in descending the James River, and coming to anchor in Hampton Roads.

We are by no means satisfied that the evidence shows such a deviation in the usual voyage from Richmond, as to authorize our interfering with the verdict of the jury.

*Judgment affirmed.*

(See opinion on the application for a re-hearing—post, p. 349 et seq.)